**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 18-cr-089-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

**1.    PERRY WAYNE SUGGS, JR.,**

     Defendant.

---

## ORDER DENYING MOTION TO SUPPRESS

---

The Government charges Defendant Perry Wayne Suggs, Jr. ("Suggs"), with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). (ECF No. 24.) Currently before the Court is Suggs's Motion to Suppress, arguing that evidence against him was obtained through two unconstitutionally overbroad search warrants. (ECF No. 54.) The Court held an evidentiary hearing on February 25, 2019. (ECF No. 77.) For the reasons explained below, the Court denies Suggs's motion.

## I.  BACKGROUND

The Court makes the following findings of fact based on the testimony and exhibits received at the evidentiary hearing.

### A.    The Shooting

On January 3, 2018, a man named Daniel Johnson was crossing a street at a crosswalk in Colorado Springs and prevented a black BMW sedan from turning.

Johnson and the driver of the BMW exchanged words, upon which the driver pulled out a black handgun and fired it at the ground near Johnson's feet. The driver sped away but a mother and daughter, who had been behind the black BMW in traffic, observed the incident and followed the BMW to the next intersection. They obtained a photo of the BMW's license plate (Colorado plate OXD692).

## B. Menter's Investigation

At some point, the police were called. A patrol officer with the Colorado Springs Police Department, Adam Menter, was the first on the scene. While there, he recovered a silver Smith & Wesson .40 caliber shell casing with the word "Speer" printed on it. He also viewed the license plate photo taken by the mother and daughter, who had returned to the scene of the shooting.

When police interviewed Johnson about the incident,[1] he was fairly certain that the license plate was UXD692, only one character off from the actual plate. Johnson described the shooter as a black male with a dark complexion, a small goatee, probably in his late 20s or early 30s, with a thin to medium build.

After obtaining this evidence, Menter continued the investigation. Using databases available to law enforcement, he found that license plate OXD692 was registered to a black BMW sedan owned by Suggs and associated with 2525 Nadine Drive, Colorado Springs. Menter found Suggs's profile in a police database and the associated photo showed a black male with a dark complexion and a goatee. Menter arranged for that photo to be part of a double-blind sequential photo line-up presented to Johnson. When Johnson reached Suggs's photo, he stated he was 80% certain that

---

[1] The record is unclear whether Menter personally interviewed Johnson or received a report of that interview as part of his investigation.

the man in the photo was the same one who shot at him.

Menter investigated Suggs further through a police database and found that he had been convicted in Colorado state court of felony menacing and felon-in-possession, and had been investigated multiple times for burglary, felony assault, and domestic violence. He was also a confirmed member of the Gangster Disciples street gang.

## C. The Nadine Drive Warrant

Menter authored an application for a warrant to search the home associated with Suggs at 2525 Nadine Drive in Colorado Springs. In his affidavit in support of a warrant (Attachment A to the application), Menter recited his investigation in detail. (ECF No. 54-1 at 4–6.)[2] He further noted, based on his "training and experience," that he is "aware that parties with gang affiliations and a history of violent criminal behavior" are "likely" to "possess more than one firearm." (*Id.* at 6.)

Concerning the scope of the search warrant, Menter's Attachment B to the warrant application proposed searching for and seizing the following items:

> GENERAL INFO
> - General photographs of the scene
> - Indicia of residency
> - Identification which would identify any occupants of
> - the residence
> GUNS INVOLVED
> - Any and all firearms: specify if known
> - Any and all ammo: specify if known
> - Any documentation showing the ownership of a
> - firearm
> - Any and all sales records showing the purchase of a
> - firearm
> - Any projectiles
> - Any and all spent shell casings
> - Any item commonly used to carry and transport a

---

[2] Admitted in evidence at the suppression hearing as Government's Exhibit 16.

- firearm (i.e. holster & gun carrying case, magazines,
- cleaning kits)

VEHICLE
- Indicia of ownership of vehicle
- Vehicle registration

MISCELLANEOUS
- Any item identified as being involved in crime

---

NO OTHER ITEMS ARE SOUGHT FOR SEIZURE

(*Id.* at 7 (formatting in original).)  Menter derived this list by drawing on a template, which he usually does because, as a patrol officer, he does not regularly write warrant applications.

A Colorado state court judge issued the warrant.  The warrant states that the reviewing judge found probable cause to search for items that "[had] been used as a means of committing a criminal offense" and items that are "illegal to possess."  (*Id.* at 2.)  The warrant described the scope of items to be seized by cross-reference to "Attachment 'B' which is hereby incorporated in [*sic*] reference."  (*Id.* at 1.)  The warrant did not incorporate Attachment A (Menter's affidavit) by reference.  The judge also issued warrants for Suggs's arrest and for the search of his black BMW sedan, which are not challenged here.

**D.    Suggs's Arrest**

The next day, January 4, 2018, Menter and another officer named Bergstresser set up surveillance of 2525 Nadine Drive at about 5:30 PM.  The black BMW sedan was parked in front of the house, but the officers saw no activity.  Just before 6:00 PM, the officers observed an unrelated incident—a man chasing a woman down the street—and decided to break off their surveillance to address that situation.  They used their patrol vehicles to catch up with the footchase, taking them out of sight of 2525 Nadine Drive.

4

As they were dealing with that situation, Bergstresser noticed Suggs's black BMW driving by.  At Menter's direction, Bergstresser returned to his patrol vehicle and followed the black BMW until the Colorado Springs version of a SWAT team, known as the Tactical Enforcement Unit ("TEU"), arrived to assist in what would presumably be the execution of the arrest warrant for Suggs.  The TEU's participation was considered prudent given Suggs's alleged volatile behavior the day before and his criminal record.

The TEU soon arrived and the officers approached the driver of the black BMW, which had been parked at a gas station.  The TEU officers identified Suggs and arrested him there pursuant to the previously issued warrant.  A member of the TEU obtained a house key from Suggs, who told the officers that no one else was inside 2525 Nadine Drive but that he had two dogs there in kennels.  Menter, having resolved whatever situation led to the footchase, showed up at the gas station later, just in time to see Suggs being placed in the back of a patrol vehicle.

**E.      Execution of the Nadine Drive Warrant**

Having obtained a house key from Suggs, the TEU then assembled at Suggs's Nadine Drive residence.  They were led by TEU officer (and acting sergeant) Teresa Tomczyk, and their goal was to "clear" the residence, or in other words, to look for any persons or things that might pose a threat to the officers who would execute the search warrant.

The Nadine Drive residence is a west-facing single-family structure with a carport attached to the south side of the home.  It looked substantially as follows on the night in question:



(Government's Exhibit 1 (excerpt).)

The TEU officers approached the front door, knocked three times and demanded entry three times, and received no response. They let themselves in with Suggs's key, "swept" the residence, and found no one inside and nothing else of note beyond two dogs in kennels.

The TEU officers then proceeded to clear the outside environs of the property. In particular, Tomczyk and another TEU officer inspected the carport, in which they found two parked vehicles: a gray sedan and a maroon Ford SUV. The following photograph is taken from the driveway leading into the carport, and it shows the gray sedan in the foreground and the outline of the Ford SUV just beyond the gray sedan:



(Government's Exhibit 3 (excerpt).)

Tomczyk shined her flashlight through the windows of both vehicles, looking for persons that might be hiding there. When she shined her flashlight into the rear cargo area of the Ford SUV, she immediately noticed an AR15-style rifle, a long magazine for that rifle, a Glock handgun, and two handgun cases. The scene looked as depicted in this photograph taken through the rear window of the Ford SUV:



(Government's Exhibit 5 (excerpt).)[3]

Eventually Tomczyk considered the scene secure and Menter arrived to conduct the search. The search team comprised Menter, a supervising sergeant named Keith Wrede, and another officer named Aaron Lloyd. Menter brought the complete warrant

---

[3] Menter took this photo a little later, as described below, but Tomczyk testified that the photo represents what she saw that night when she shined her flashlight into the Ford SUV. Only the barrel of the handgun is visible in the photo, at the bottom center. Only one of the Glock cases is visible in the photo, just above the flashlight glare on the window.

with him, including Attachment A (his affidavit).[4]  Menter does not know if Wrede or

Lloyd reviewed the warrant package.  Menter's usual practice is to brief other officers

about what they will be searching for before executing the warrant, but he could not

recall if he did so in this case.[5]

Menter also could not recall if either of those officers physically entered the

Nadine Drive residence before he did.  He remembered, however, that he first took

pictures of the undisturbed interior of the residence before he and the other officers

began searching for evidence.

When the search began, Menter began in the living room, working his way

through that room and a connected dining room into a connected kitchen (from living

---

[4] In pre-hearing briefing, the parties appeared to agree that Menter's affidavit was *not* attached to the executed warrant.  (ECF No. 54 at 1, 3; ECF No. 58 at 6.)  The Court called for a supplemental brief from the Government on this matter because Menter's affidavit "appear[s] to be part of one physically connected package containing the warrant itself, the cover page of the application, attachment A (the affidavit), and attachment B (the scope of the warrant . . .)."  (ECF No. 69.)  The Court therefore asked the Government to explain "its basis for asserting that the warrant affidavit[] [was] not physically attached to the resulting warrant[]."  (*Id.*)  The Government responded that the application submitted to the reviewing judge was a physically connected package containing all the items just described, but that the officers did not leave the entire packet at 2525 Nadine Drive after executing the warrant because "Colorado Springs Police Department officers are taught not to leave warrant affidavits with the warrants at the scene" due to sensitive information sometimes contained in those affidavits.  (ECF No. 70 at 1.)  However, the Government continued, neither Menter nor Wrede could "remember if the warrant packages (including the affidavits) were taken to the scene."  (*Id.* at 2.)  Nonetheless, at the hearing, Menter himself testified that he "usually" brings the "entire copy" with him when executing warrants, but he simply could not "picture it in [his] head if it was with [him]" when he executed the Nadine Drive warrant.  The Court is thus persuaded that Menter brought the full warrant package with him.  Menter's hesitance to say as much reflects his desire not to testify beyond his memory, and does not convince the Court that the package he brought to 2525 Nadine Drive failed to include the affidavit.

[5] His testimony was scattered on the subject, particularly as to Lloyd.  Menter began by saying that he could not recall if he gave any briefing, although he usually does.  He later stated that he informed Lloyd of "the type of things we were looking for."  But, even later, he stated that Lloyd "wasn't there much, if any"; that the briefing would have been with Wrede; and that perhaps Wrede briefed Lloyd.  Nonetheless, the Court did not get the sense that Menter was changing his story so much as exploring his memory of details that he had not before considered, and that he was waxing and waning in his certainty about those details.

room to kitchen was "an open space" with "no walls in between"). Lloyd started in the kitchen. Wrede began in a bedroom he reportedly characterized as "the grandfather's bedroom."

Before Menter made his way to the kitchen, Lloyd found there, above the microwave, a box of ammunition. He called Menter over, who observed that the ammunition was Smith & Wesson .40 caliber with the word "Speer" printed on it—thus matching the shell casing Menter had found at the scene of the shooting. There was also one round of a different kind of .40 caliber ammunition. The officers seized the ammunition as evidence.[6]

In the kitchen or the dining room, Menter located and seized a bank statement addressed to Suggs at 2525 Nadine Drive. Menter and Lloyd then moved to a "back bedroom" (not the same as "the grandfather's bedroom" where Wrede searched). There, Menter located a retail sale contract for the black BMW sedan, which he seized as evidence.

Finally, Menter searched the bathroom, but found nothing.

## F.    The Ford SUV Warrant

At some point, Tomczyk informed Menter of the items she had observed in the rear cargo area of the Ford SUV. It is not clear if this conversation happened before or after Menter and his partners searched the residence. Regardless, Menter himself went to the carport, shined his flashlight through the rear window of the Ford SUV, observed

---

[6] The additional round of ammunition and the fact that the officers seized all of it did not come into evidence at the hearing. The details of certain papers that were seized and the fact that the papers were seized, as described below, also did not come into evidence at the hearing. These facts are reported in Menter's after-action report, which was the Government's proposed Exhibit 20 (never moved into evidence), and which Suggs previously put into the record as ECF No. 54-4. Because these facts appear undisputed, the Court disregards the lack of evidence introduced to support them at the hearing itself.

what Tomczyk had observed, and took the photo reproduced above. Menter ran the Ford SUV's plate and learned that it was registered to someone named Camisha Mobley. Mobley herself showed up after the search of the residence had concluded, reporting that she had come to take care of the dogs in the house. Menter had a conversation with her about the Ford SUV. Mobley reported that the vehicle belonged to her but she had loaned it to Suggs over a year ago.

Menter then returned to the police station and authored a new warrant application for the Ford SUV. (ECF No. 54-5.)[7] The accompanying affidavit (again, "Attachment A") repeated verbatim the affidavit from the Nadine Drive application and then added a description of the Nadine Drive search and Menter's subsequent conversation with Mobley. As for the scope of the search, the application again contained an "Attachment B," which was identical to the previous Attachment B (quoted in Part I.C, above) except that ": specify if known" was removed from the first two lines under the "GUNS INVOLVED" heading. A Colorado state court judge issued the warrant, again setting forth the scope by cross-reference to Attachment B, and not incorporating Attachment A by reference.

## G. Execution of the Ford SUV Warrant

Menter and his partner from earlier that evening, Bergstresser, executed the warrant on the Ford SUV at about 10:20 PM that same night. Wrede supervised. Menter seized the Glock handgun, the rifle, the ammunition, the Glock carrying cases, and also the vehicle's registration document (which indeed showed Mobley as the

---

[7] Admitted in evidence at the suppression hearing as Government's Exhibit 17.

registered owner).[8]

## II. ANALYSIS

### A.    General Standards and Burdens

Suggs invokes the Fourth Amendment's "particularity requirement," italicized

below:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing the place to be searched, and the persons or things to be seized.*

The purpose of the particularity requirement is to prohibit "the 'general warrant'

abhorred by the colonists" and thereby prevent an "exploratory rummaging in a person's

belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). "The particularity

requirement ensures that a search is confined in scope to particularly described

evidence relating to a specific crime for which there is demonstrated probable cause."

*Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985).

At times the Tenth Circuit has employed demanding and inflexible language

when speaking about this requirement, for example: "[T]he fourth amendment requires

that the government describe the items to be seized with as much specificity as the

government's knowledge and circumstances allow, and warrants are conclusively

invalidated by their substantial failure to specify as nearly as possible the distinguishing

characteristics of the goods to be seized." *United States v. Leary*, 846 F.2d 592, 600

(10th Cir. 1988) (internal quotation marks omitted). But even so, "[t]he test applied to

---

[8] The Government claims that later ballistic analysis confirmed that the Glock handgun found in the Ford SUV was the weapon that ejected the spent shell casing found at the scene of the shooting. (ECF No. 58 at 4.) This is immaterial to the charges Suggs currently faces.

the description of the items to be seized is a practical one." *Id.* Thus, "[w]hen interpreting warrants, [the question is] practical accuracy rather than technical precision." *United States v. Ortega-Jimenez*, 232 F.3d 1325, 1328 (10th Cir. 2000) (internal quotation marks omitted). A warrant may be upheld even if it "could have been clearer." *United States v. Simpson*, 152 F.3d 1241, 1248 (10th Cir. 1998); *see also id.* (requiring "a practical rather than a technical standard").

A particularity challenge usually precedes in up to four phases. At the first phase, it is the defendant's burden to show a particularity problem on the face of the warrant. *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994) ("Generally, if the search or seizure was pursuant to a warrant, the defendant has the burden of [proving that the search violated the Fourth Amendment]." (internal quotation marks omitted)). The face of the warrant alone, without reference to other materials (*e.g.*, the supporting affidavit), may be enough either to establish—or at least raise a sufficient suspicion of—a failure of particularity, *see, e.g.*, *Cassady v. Goering*, 567 F.3d 628, 635 (10th Cir. 2009), or to dispel that suspicion, *see, e.g.*, *Andresen v. Maryland*, 427 U.S. 463, 478–82 (1976).

If the warrant raises particularity concerns not cured by other context on the face of the warrant, the analysis moves to the second phase. At this phase, the question is whether the affidavit in support of the warrant may be consulted to "cure" language that might otherwise be "overbroad." *Leary*, 846 F.2d at 603. "Two requirements must be satisfied to reach this result: first, the affidavit and search warrant must be physically connected so that they constitute one document; and second, the search warrant must expressly refer to the affidavit and incorporate it by reference using suitable words of

reference." *Id.* (internal quotation marks omitted; alterations incorporated).  If both requirements are satisfied, the affidavit is considered part of the warrant and the context the affidavit provides may be considered.  But even if these requirements are not satisfied, the task of giving the warrant a "practical" interpretation may still draw on the affidavit if "the same officer both produced the affidavit and executed the warrant." *Ortega-Jimenez*, 232 F.3d at 1329.

Because this second phase is, like the first phase, dealing with practical construction of the warrant, the Court presumes that the burden remains on the defendant.  This means both the factual burden of proof to show that the *Leary* and *Ortega-Jimenez* requirements are not satisfied, or, if they are satisfied, the burden of persuasion that the affidavit nonetheless fails to provide the necessary context to provide a "practical" construction that avoids particularity problems.

The third phase arises if the defendant persuades the Court that the *Leary* and *Ortega-Jimenez* requirements were not satisfied (such that the affidavit cannot be considered), or that the warrant still lacks particularity even considering the affidavit.  At this phase, the question is whether the insufficiently particular parts of the warrant may be severed.  "The infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant, but does not require the suppression of anything described in the valid portions of the warrant (or lawfully seized—on plain view grounds, for example—during their execution)." *United States v. Brown*, 984 F.2d 1074, 1077 (10th Cir. 1993) (internal quotation marks omitted; alterations incorporated).  "To make the severability doctrine applicable the valid portions of the warrant must be sufficiently particularized, distinguishable from the invalid portions, and make up the

greater part of the warrant." *United States v. Naugle*, 997 F.2d 819, 822 (10th Cir. 1993). "Greater part" is a qualitative more than a quantitative analysis. *See United States v. Sells*, 463 F.3d 1148, 1159–60 (10th Cir. 2006).

The burden at this third phase appears to fall on neither the defendant nor the Government. The Tenth Circuit has spoken of severability as an analysis that falls on the Court, with no hint of a default presumption in favor of upholding or striking down the warrant. *See id.* at 1158–62.

Finally, if severability is unjustified, the fourth phase asks whether the officers executing the warrant relied on it in good faith. *United States v. Leon*, 468 U.S. 897, 920 (1984); *see also Massachusetts v. Sheppard*, 468 U.S. 981, 987–88 (1984). If a police officer's "reliance on the magistrate's determination of probable cause [and consequent approval of a search warrant] was objectively reasonable, [then] application of the extreme sanction of exclusion is inappropriate." *Leon*, 468 U.S. at 926. But, "depending on the circumstances of the particular case, a warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* at 923. The Government bears the burden to persuade the Court that the good faith exception should apply. *See id.* at 924 ("When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time.").[9]

---

[9] These four phases are well-established in the case law, but there is no explanation of why a severance analysis should precede a good faith analysis. It stands to reason, at least, that if an objectively reasonable officer could rely in good faith on a warrant, severability and its consequent partial suppression of evidence is inappropriate. But the circumstances of this case give the Court no reason to explore this tension further.

Here, steps one and two resolve Suggs's motion, so the Court need not analyze steps three or four.

**B.  Both Warrants: "Any Item Identified as Being Involved in Crime"**

1.  Facial Analysis

Suggs primarily challenges the bullet point under the "MISCELLANEOUS" section of both warrants: "Any item identified as being involved in crime."  The absence of a definite or indefinite article before "crime" means this language could be read as Suggs reads it, that is, to authorize a search for anything associated with any crime. (ECF No. 54 at 7–8.)  The Government responds that Suggs's reading "is not a practical reading of the warrant on its face. . . .  'Crime' indicates one incident . . . .  [C]ontext supports that reading."  (ECF No. 58 at 5.)  Both Suggs and the Government have case law arguably supporting their competing views.

On the Government's side is *Andresen*, *supra*, where the two warrants in question defined their scope through an elaborate run-on sentence describing numerous items relevant to the "sale, purchase settlement and conveyance of lot 13, block T," but concluding with "together with other fruits, instrumentalities and evidence of crime at this [time] unknown."  427 U.S. at 479–80 & n.10 (alteration in original).  The Supreme Court upheld the warrants, reasoning that

> the challenged phrase must be read as authorizing only the search for and seizure of evidence relating to the crime of false pretenses with respect to Lot 13T.  The challenged phrase is not a separate sentence.  Instead, it appears in each warrant at the end of a sentence containing a lengthy list of specified and particular items to be seized, all pertaining to Lot 13T.  We think it clear from the context that the term "crime" in the warrants refers only to the crime of false pretenses with respect to the sale of Lot 13T.

*Id.* at 480–81 (citations, certain internal quotation marks, and footnote omitted).  In other

words, a general reference to "crime," not preceded by a definite or indefinite article, can, in context, be construed to contain the definite article and thereby to refer back to the suspected crime that justifies the warrant.

On Suggs's side is *Cassady*, *supra*, a civil lawsuit claiming that a search warrant was so obviously overbroad on its face that the sheriff who supervised its execution could be held liable under the Fourth Amendment via 42 U.S.C. § 1983. The suspected crime was illegal cultivation of marijuana, but the deputy sheriff assigned to draft the warrant "had never before sought a drug-related search warrant" and "admitted to not knowing what he was doing," so he obtained some amount of assistance from "an officer in another police department who had experience with drug-related investigations." 567 F.3d at 632. But the deputy sheriff apparently did not receive the sort of help he needed, because the resulting warrant was an "ungrammatical" mess, *id.* at 635, particularly in its use of fragmentary paragraphs interrupting other paragraphs— as if language was hastily copied and pasted from templates or prior warrants with no thought to where it should go, even if in the middle of an unrelated sentence, *see id.* at 645–46.[10] Although much of this language arguably related to marijuana cultivation, the warrant also explicitly authorized a search for "all other evidence of criminal activity." *Id.* at 645. As if to dispel any possibility of finding that phrase ambiguous, the warrant went on to authorize a search for evidence

> that [seized] property is stolen or embezzled; or is designed or intended for use as a means of committing a criminal offense; or is or has been used as a means of committing a criminal offense; or the possession of which is illegal; or

---

[10] "In fact, it seems the officer took a form warrant that could be applied to almost any crime and added language but deleted nothing, thereby creating an extremely broad warrant." *Id.* at 636 n.5.

> would be material evidence in a subsequent criminal
> prosecution in this state or another state; or the seizure of
> which is expressly required, authorized or permitted by any
> statute of this state.

*Id.* at 645–46. The Tenth Circuit held that the warrant was facially overbroad, that the overbroad portions could not be severed from the valid portions, and that the sheriff could not have reasonably relied on it. *Id.* at 635–44.[11]

This case is much closer to the *Andresen* end of the spectrum than the *Cassady* end. The only potentially significant difference is that, in *Andresen*, the phrase "together with other fruits, instrumentalities and evidence of crime at this [time] unknown," 427 U.S. at 480 n.10 (alteration in original), came at the end of a single run-on sentence, whereas the corresponding phrase in Menter's warrants—"[a]ny item identified as being involved in crime"—was the last bullet point among many, and under a separate heading. But the Court does not understand *Andresen* to hold that the key feature of a valid warrant in this circumstance is the purely formal mechanism of a run-on sentence, so that otherwise similar warrants will survive a challenge if formatted as a run-on sentence, but may be invalidated if formatted with mechanisms readily available in modern word processing programs that make lists easier to read. The point of

---

[11] At the suppression hearing, Suggs also emphasized *Groh v. Ramirez*, 540 U.S. 551 (2004). In *Groh*, the search warrant affiant accidentally repeated the description of the location to be searched in the portion of the proposed warrant where he should have specified the items to be seized. *Id.* at 554–55. The Supreme Court held that this warrant "was plainly invalid." *Id.* at 557. This circumstance—total failure to list the items to be seized—does not apply here. Suggs also emphasized the non-precedential decision in *United States v. Dunn*, 719 F. App'x 746 (10th Cir. 2017). Even if *Dunn* were binding, the two opinions in that decision do not provide sufficient detail about the warrant to permit this Court to make a reasoned comparison. But it appears the primary problem was that the list of items to be seized was preceded by an "include but are not limited to" clause and a generic authorization to look for "other" items (in contrast to, *e.g.*, items that had been used in committing a crime, items that would be illegal to possess, etc.). *Id.* at 748–49, 755. Those infirmities are not comparable to the alleged infirmities at issue here.

*Andresen* was that the formatting of the warrant (which happened to be a run-on sentence in that case) was enough to assure the Supreme Court that "crime," unmodified by a definite or indefinite article, must refer back to the crimes under investigation.

Here, the Court is similarly assured.  Nothing in the two warrants suggests that the final bullet point should be read disjunctively from all preceding bullet points.  And the Court is not persuaded that the heading "MISCELLANEOUS" before the final bullet point changes this analysis.  That heading is substantively no different from the words "together with other fruits, instrumentalities and evidence" in the *Andresen* warrant.

Even so, there is a subtle elision in the *Andresen* analysis that this Court likely should not ignore.  In *Andresen*, the Supreme Court was assured "from the context that the term 'crime' in the warrants refers only to the crime of false pretenses with respect to the sale of Lot 13T."  427 U.S. at 480–81.  But nothing in the *Andresen* opinion establishes how any executing officer would know that "the crime of false pretenses" was at issue.  The header to the run-on sentence refers to the "sale, purchase settlement and conveyance of lot 13, block T," *id.* at 480 & n.10, but does not name any *crime* potentially associated with those activities.  The Supreme Court provides no other details about the warrant that might have supplied this detail to the executing officers.[12]

*Andresen* apparently found this untroubling, and so—following *Andresen*—it may likewise be untroubling here, although the two Attachment B's do not describe what crimes may be at issue and neither do the warrants themselves.[13]  Under that analysis,

---

[12] Nor does the lower court opinion under review.  *See Andresen v. State*, 331 A.2d 78, 102–03 (Md. Spec. App. 1975).

[13] Menter's affidavits provide this context, but they were not incorporated by reference

the "MISCELLANEOUS" section of the two warrants is not insufficiently specific, does not authorize an "exploratory rummaging," *Coolidge*, 403 U.S. at 467, and therefore does not raise particularity concerns.

      2.     Menter's Participation in the Searches

      If *Andresen* should not be read as facially validating the "MISCELLANEOUS" section of the two warrants in this case, the Court may nonetheless give that section a practical construction with reference to Menter's affidavits, if the affidavits were attached to and incorporated by reference in the warrants, *Leary*, 846 F.2d at 603, or if Menter (the affiant) executed the warrant, *Ortega-Jimenez*, 232 F.3d at 1329.

      Menter's affidavits were attached to, but *not* incorporated by reference in, the respective warrants. *Leary* therefore cannot apply. But Menter *did* execute the warrant, so it appears that his affidavits may provide context for a practical construction, per *Ortega-Jimenez*. The only potentially lingering question is the effect of multiple executing officers, or in other words, how much must the officer-affiant participate in a search carried out by that officer *among others* to fairly say that the officer-affiant "executed" the warrant? *Ortega-Jimenez* itself demonstrates that the officer-affiant need not be the sole officer involved in the execution. *See* 232 F.3d at 1328 ("Detective Ferguson [the officer-affiant] arrived with the search warrant and executed it. The Detectives [plural] picked the two locks on the storage unit and opened it. The search of the storage unit yielded a large quantity of controlled substances and paraphernalia associated with the distribution of controlled substances. Following the search of the storage unit, the Detectives [plural] conducted a further search of Juan, Armando, and

---

into the warrants—a matter the Court addresses in Part II.B.2.

the white pickup truck.  They found no evidence on the person of either Juan or Armando.  Their search of the pickup truck, however, yielded keys that fit the locks on the storage unit.").  But must the officer-affiant be part of every aspect of the search (*e.g.*, be present in the same room where other officers are searching)?  Must the officer-affiant be the first one in the door and the last one out?

Suggs does not mount a challenge along these lines, so the Court need not resolve the question.  But, in the unlikely event it would be plain error not to address it, the Court would find that Menter participated in both searches in a manner consistent with saying that he "executed" both warrants, despite the assistance of other officers.  As to Nadine Drive, Menter was present and available the entire time, at least within earshot of other officers, in what was a fairly small residence (a connected living room/dining room/kitchen, two bedrooms, and a bathroom).  As to the Ford SUV, the same is also true for an even more confined area.

Because Menter authored the affidavit and executed the warrant, the Court may consider the affidavit when giving the warrant a practical construction.  In this light, any lingering doubt about *Andresen*'s applicability is dispelled because the reference to "crime" may receive limiting context through Menter's own knowledge of the contents of his affidavit and of the crimes under investigation.  In that light, the "MISCELLANEOUS" section of the two warrants, practically construed, does not fail on particularity grounds.

## C.    The Nadine Drive Warrant

Suggs also argues that the vehicle-related and gun-related portions of the Nadine Drive warrant are insufficiently particular.

### 1.    The Vehicle-Related Portions of the Warrant

Suggs argues that the two bullet points under the heading "VEHICLE"—namely,

"[i]ndicia of ownership of vehicle" and "[v]ehicle registration" (ECF No. 54-1 at 7)—

render the Nadine Drive warrant overbroad because "[t]he government already knew

that the vehicle involved in the shooting was a black BMW registered to Mr. Suggs, and

thus should have specified what kind of vehicle was the target of the search."  (ECF No.

54 at 7.)  Ideally, Menter would have done so, but warrants may survive particularity

challenges even if they "could have been clearer."  *Simpson*, 152 F.3d at 1248.  Given

that Menter was the affiant and the executing officer, as discussed above (Part II.B.2), a

practical construction of the challenged bullet points demands that the Court construe

them as narrowed to Suggs's black BMW sedan.

Suggs further argues that "a search for *any* vehicle was unnecessary: By the

time that the search was executed, the black BMW associated with the crime being

investigated was in the government's possession."  (ECF No. 54 at 7 (emphasis in

original).)  But the warrant did not authorize a search for a vehicle, much less "*any*

vehicle."  It only authorized a search for documentary evidence related to the vehicle.

To the extent Suggs means to say that the warrant need not have authorized a search

for documentary evidence related to the vehicle because the Colorado Springs police

already had evidence supporting ownership and registration, then: (a) it is not clear that

this goes to the *particularity* of the challenged bullet point; and (b) Suggs cites no

authority, and the Court has found none, holding that a warrant may be invalidated

because the police already have evidence of the same type they wish to search for.

For all these reasons, Suggs's particularity challenge to the vehicle-related

portions of the Nadine Drive warrant cannot succeed.

2.      The Gun-Related Portions of the Warrant

For the first time in his reply brief, Suggs argues that the "GUNS INVOLVED"

section of the Nadine Drive warrant is overbroad because it authorized a search for any type of firearm or ammunition when the Colorado Springs police knew they were searching for "a black handgun of a specific caliber." (ECF No. 63 at 5.) Suggs argues that this is all the more egregious because whatever template Menter worked from contained the words "specify if known" after "[a]ny and all firearms" and "[a]ny and all ammo" (ECF No. 54-1), yet Menter did not specify what he was searching for. Although the Court could treat this argument as forfeited given that Suggs only raised it for the first time in his reply brief, the Court will reach it anyway because the outcome on the merits is plain.

The fact that Menter knew the caliber of the firearm to search for, or even the color to search for, does not mean he could *only* search for that type of gun and ammunition. To begin, on the cover page to the warrant application, Menter represents that "probable cause exists" to seize the items listed in Attachment B because "probable cause exists to believe that [they] . . . [are] or [have] been used as a means of committing a criminal offense *or* [they are] illegal to possess." (ECF No. 54-1 at 3 (emphasis added).) The reviewing judge approved these search justifications. (*Id.* at 2.)

Next, in the warrant affidavit, Menter noted that Suggs already had violent felonies on his record, and also a conviction for "Felony Possession of a Weapon by a Previous Offender." (*Id.* at 6.) Any felony on a criminal record at least gives rise to a suspicion that the felon cannot possess a firearm, and surely someone who has already been convicted specifically of felon-in-possession cannot legally possess a firearm, absent exceedingly unusual circumstances.

Finally, Menter concluded his affidavit by noting Suggs's Gangster Disciples membership and that, through experience, Menter has learned "that parties with gang affiliations and a history of violent criminal behavior" are "likely" to "also possess more than one firearm." (*Id.*)

In sum, Menter's application demonstrated probable cause to search for any and all firearms and ammunition, along with related paraphernalia. Attachment B to the Nadine Drive warrant justifiably instructed executing officers that they could search for those items, and need not have been more particular.[14]

### D.    The Ford SUV Warrant

#### 1.    Generally

Suggs separately challenges the search of the Ford SUV. Specifically, he claims that Tomczyk did not view the guns in the Ford SUV from a lawful vantage point and so the resulting warrant was invalid because it was based on Tomczyk, and then Menter, unlawfully viewing the guns; and, in any event, the scope of the warrant was insufficiently specific.

If the warrant for 2525 Nadine Drive was valid, and the Court has concluded that it was, it is not clear these arguments matter. "[A] warrant authorizing the search of a certain premises that is otherwise adequately described permits officers to search vehicles located on the curtilage when the objects of the search might be located in those vehicles, even though the warrant does not specifically authorize the search of vehicles." *United States v. Dahlman*, 13 F.3d 1391, 1394–95 (10th Cir. 1993). Suggs

---

[14] For the first time in his reply brief, Suggs asserts that "no part of the warrant satisfies the particularity requirement." (ECF No. 63 at 5.) In support, however, he only challenges the two gun-related bullet points and the two vehicle-related bullet points discussed already. (*Id.*)

asserts, and it is probably undeniable in any event, that the carport was part of his curtilage.  (ECF No. 63 at 8.)  *See also Collins v. Virginia*, 138 S. Ct. 1663, 1675 (2018) ("So long as it is curtilage, a parking patio or carport into which an officer can see from the street is no less entitled to protection from trespass and a warrantless search than a fully enclosed garage.").  Accordingly, Tomczyk or Menter, or both, probably could have performed a full Fourth Amendment search of the Ford SUV on the authority of the Nadine Drive warrant, without first gaining suspicion that guns might be in the vehicle. The second warrant was belt-and-suspenders, so to speak.[15]

The Government, however, does not make any such argument.  The Court will therefore resolve the matter on the arguments presented.

2.  Standing

The Government first contests Suggs's standing to challenge the search of the Ford SUV because Mobley, not Suggs, was the vehicle's owner.  (ECF No. 58 at 11–12.)  *See also Alderman v. United States*, 394 U.S. 165, 174 (1969) ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted."). When a defendant moves to suppress a vehicle search but is not the vehicle's registered owner, the defendant "bears the burden of establishing that he gained possession from the owner or someone with authority to grant possession."  *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009) (internal quotation marks omitted).

---

[15] Even if the warrant for 2525 Nadine Drive was invalid, the Court would find that Tomczyk relied on it in good faith.  *See Leon*, 468 U.S. at 920–26.  Thus, for the reasons just explained and other reasons explained below, she could *at least* stand in the carport and shine her flashlight into vehicles parked there.  Her knowledge alone of what she saw (apart from showing it to Menter), combined with everything Menter knew before executing the Nadine Drive warrant, would have been enough to justify the Ford SUV warrant, assuming it was sufficiently particular.

The Government's only argument in this regard is that Suggs has not satisfied his burden.  (ECF No. 58 at 1.)  But Mobley told Menter that she was the Ford SUV's owner (which turned out to be true) and that she had loaned it to Suggs.  Furthermore, the vehicle was also parked on Suggs's property, not Mobley's.  Finally, the gun used to commit the crime was found inside that vehicle.  The Court finds that Suggs has discharged his burden to establish his standing to contest the search of the Ford SUV.

3.  <u>"Protective Sweep" & "Plain View"</u>

Tomczyk characterized her activities in and around the carport at 2525 Nadine Drive as part of a protective sweep to ensure no one was hiding in the Ford SUV.  Suggs argues that the Supreme Court's "protective sweep" doctrine only extends to executing arrest warrants when there is a specific, articulable basis for believing that someone dangerous is on the property at the time of execution.  Here, the Colorado Springs police were not executing an arrest warrant.  Suggs claims that Tomczyk thus could not conduct a protective sweep and, in consequence, was not lawfully in a place where she could peer into the Ford SUV's rear window and see the guns and ammunition in the vehicle's passenger compartment.  (ECF No. 54 at 9–12.)  In response, the Government "does not rely on a protective sweep theory," but instead argues that Tomczyk was lawfully on the premises because the search warrant was valid and the guns and ammunition were in "plain view" from a place Tomczyk could lawfully be while executing the warrant.  (ECF No. 58 at 11–12.)

"Plain view," according to the Government's cited authorities (*see* ECF No. 58 at 12), governs when an item outside the scope of a search warrant may be seized while executing that warrant.  *See United States v. Soussi*, 29 F.3d 565, 570 (10th Cir. 1994); *see also Coolidge*, 403 U.S. at 465–66.  Neither Tomczyk nor Menter seized the guns

inside the Ford SUV without a warrant.  So "the concern here is with plain view in a quite different sense, namely, as descriptive of a situation in which [according to the Government] there has been no Fourth Amendment search at all."  1 Wayne R. LaFave, *Search & Seizure* § 2.2(a) (5th ed., Oct. 2018 update).

> It is a fair generalization that if a law enforcement officer is able, by the use of his natural senses, to discover what is inside a vehicle while standing in a place where he had a right to be, this discovery does not constitute a Fourth Amendment search.
>
> * * *
>
> If a vehicle is located on private property, but the police have made a lawful entry upon that property for some legitimate reason, what they see in plain view in the car while present at a place on that property consistent with the reason for their presence is also admissible.

*Id.* § 2.5(c) (internal quotation marks and footnotes omitted).

Suggs's arguments exclusively assume that Tomczyk lacked a valid warrant, and so, at best, her only lawful vantage points were the walkway up to the front porch and the front porch itself.  (ECF No. 63 at 8–9.)  *See also Florida v. Jardines*, 569 U.S. 1, 8 (2013) (police officers without a warrant may nonetheless "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave . . . because that is no more than any private citizen might do").  Tomczyk could not enter the carport on the pretense of doing would any other private citizen may do.  *See Collins*, 138 S. Ct. at 1675

However, the Court has found that the Nadine Drive warrant was valid.  Furthermore, the warrant named the carport as part of the premises to be searched.  (ECF No. 54-1 at 2.)  Thus, Tomczyk, and then Menter, could lawfully view the guns inside the SUV while standing in the carport.  Accordingly, no "search" within the

meaning of the Fourth Amendment occurred when they viewed the guns with their own eyes.

### 4. The Gun-Related Portions of the Warrant

Suggs further argues that the "GUNS INVOLVED" section of Ford SUV warrant's Attachment B was insufficiently specific. (*See* ECF No. 54 at 13; ECF No. 63 at 9.) Suggs points out that Menter knew precisely which firearms and ammunition he was searching for—having seen them through the window—and so should not have requested (or received) permission to search for "[a]ny and all firearms" or "[a]ny and all ammo." (*Id.*)

For the same reasons already discussed (Part II.C.2), Menter's warrant application fully justified a search for all firearms, ammunition, and related paraphernalia, given the suspicion that Suggs was unlawfully possessing firearms and the reason to believe that he possessed more than one. No requirement of which the Court is aware, from the Fourth Amendment or otherwise, mandated that Menter could only search for the gun used in the shooting the day before. Accordingly, Suggs's argument in this regard fails.

### III. CONCLUSION

For the reasons explained above, Suggs's Motion to Suppress (ECF No. 54) is DENIED. By separate order, the Court will set a new trial date and related deadlines.

Dated this 11th day of March, 2019.

BY THE COURT:

_____
William J. Martinez
United States District Judge